J. Evan Shapiro (SBN 218481)
eshapiro@taulersmith.com
Camrie Ventry (SBN 355853)
cventry@taulersmith.com
TAULER SMITH LLP
626 Wilshire Boulevard, Suite 1100
Los Angeles, California 90017
Tel: (213) 927-9270

*Attorneys for Plaintiff Jane Heiting*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE HEITING, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>POWERFLEET, INC., a Delaware corporation; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR**<br><br>**(1) USE OF A TRAP AND TRACE DEVICE IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CAL. PENAL CODE § 638.51);**<br><br>**(2) INTRUSION UPON SECLUSION** |

CLASS ACTION COMPLAINT

**INTRODUCTION**

1.      Plaintiff, on her behalf and on behalf of a class of similarly situated persons brings this action against Defendant Powerfleet, Inc. ("Defendant" or "Powerfleet"), a Delaware corporation, that sells hardware and software (including platforms) and management services to proprietors or businesses in such industries as mining, oil and gas, security and government.

2.      Defendant has installed and deployed data broker software on its website – https://www.mixtelematics.com/us/ (the "Website") – to secretly collect data about visitors to the Website, their devices and locations, and the pages they've navigated to, to identify who they are, target them with unwanted marketing and track them on an ongoing basis.

3.      The data broker software compiles the data collected from visits to the Website and correlates it with extensive external records it already has about most Californians in order to learn the identity of Website visitors.  In addition, Defendant and the Website utilize software owned by the social media platform-operating LinkedIn Corporation ("LinkedIn") that operates in a substantially similar manner.

4.      Both Defendant and the third-party data collectors involved benefit commercially and financially from this activity.  They benefit because collected visitor data, and the identification of visitors using that data, are used to, among other things, target Website visitors for specific marketing. Related to the inclusion of LinkedIn code on the Website, Defendant runs a substantial number of marketing campaigns on the LinkedIn platform.[1]

5.      Defendant's installation and use of data broker software, and code

_____

[1] A recent search conducted of LinkedIn's library of ad campaigns running on LinkedIn retrieved 122 separate ads run by Powerfleet on the platform. *See* https://www.linkedin.com/ad-library/search?accountOwner=powerfleet (last visited 3/12/2026).

CLASS ACTION COMPLAINT

2

supplied by LinkedIn, without obtaining consent or authorization therefore violated California Penal Code § 638.51, California's Trap and Trace Law and duties Defendant owed to Plaintiff and other visitors to the Website similarly situated under applicable common law.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class.  Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

7.      Defendant Powerfleet is a Delaware corporation that is headquartered in New Jersey.  This Court has specific personal jurisdiction over Defendant with respect to all claims asserted in this action.

8.      Through the Website, Defendant sells products and services to proprietors and businesses in California.  Although Defendant does not disclose all of its clients publicly, Plaintiff expects that discovery will reveal that California represents a large and highly valuable market for Defendant's products and services. Defendant maintains ongoing commercial relationships with such California customers and residents.  Defendant derives substantial revenue from California-based transactions through its operation of the Website.  Defendant deliberately reaches out to persons browsing the internet from locations in California, availing itself of its opportunity to conduct business in California through the Website. Defendant intended and understood that such persons would suffer injury in California.

9.      Defendant's sales into California are aided by marketing on social media platforms such as LinkedIn, a California headquartered company. The sales are also aided by the collection of data by LinkedIn code Plaintiff installed on the

Website, which allows LinkedIn to target visitors to the Website, who use the LinkedIn platform, with specific advertising that is chosen based on those visitors' actions while on the Website and personal attributes.

10. Defendant's use of the LinkedIn code and advertising services are governed by a User Agreement that contains two provisions that tie this action to California. First, the User Agreement provides that any legal dispute between Defendant and LinkedIn relating to LinkedIn's code and services is governed by California law.[2] Second, it provides that all claims and disputes between Defendant and LinkedIn "can be litigated only in the federal or state courts in Santa Clara County, California, USA" and that Defendant "agree[s] to personal jurisdiction in those courts."

11. Additionally, the two data brokers whose code Defendant installed on its Website and the deployment of which forms the basis of Plaintiff's claims (and those of the putative class), 6Sense and The Trade Desk, Inc. ("Trade Desk"), are headquartered in San Francisco, California and Ventura, California, respectively. This means that the data collected by the Website is transmitted to 3 companies based in California.

12. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; and (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District.

## PARTIES

13. Plaintiff Jane Heiting ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of California residing and located within the Central

---

[2] *See* https://www.linkedin.com/legal/user-agreement (last viewed 3/12/2026).

District of California. Plaintiff maintains reasonable expectations of privacy when browsing websites.

14. Defendant is a Delaware corporation that sells hardware and software (including platforms) and management services to proprietors or businesses in such industries as mining, oil and gas, security and government.

15. Defendant runs campaigns promoting its products and services on the LinkedIn social media platform. The platform utilizes visitor data – collected by LinkedIn software that companies engaged in marketing, such as Defendant, install on their websites – to include specific campaigns for those advertising companies on the LinkedIn "feeds" of individuals who have visited the websites of those companies and/or viewed certain pages on their websites.

16. For example, a search conducted on March 13, 2026, revealed 122 social media campaigns run by Defendant on LinkedIn. A PDF printout of the search results are appended hereto as **Exhibit A**.

17. Plaintiff identifies DOE Defendants 1 through 10 as unknown entities that Defendant directed and controlled to participate in implementing or maintaining Defendant's system. Plaintiff will seek leave to amend this Complaint to identify these entities when Defendant's discovery responses reveal their true names and roles.

18. Each DOE Defendant acted as Defendant's agent or employee in Defendant's implementation of the surveillance scheme described herein. Each DOE Defendant operated within the scope of its relationship with Defendant and participated with Defendant in the common plan to unlawfully track California residents for Defendant's commercial gain.

### FACTUAL ALLEGATIONS

19. Defendant is the proprietor of the Website.

20. The Website, like most other websites, due to code or software programs running on the Website, determines the state and sometimes the city in

which its visitors are located – between the time a visitor requests to go to the Website (through clicking a link or typing its address into the browser address bar), and the time the Website loads on the visitors' screens. This location gathering occurs separately and apart from the Data Broker software and the social media platform code running on the Website that forms the basis of Plaintiff's claims in this action. Therefore, Defendant has at the very least constructive knowledge that the data broker and LinkedIn software on the Website that is the subject of this action operated on Plaintiff, and visitors to the Website similarly situated from California, *while they were located in California*. It had such knowledge during the time the statutory law and common law duty violations alleged herein occurred.

21. On May 9, 2025, Plaintiff visited the Website. When she did, data that reasonably likely identified her as being the party that visited the Website were transmitted to at least three (3) third parties who used and profited from that data, along with Defendant: 6 Sense, Trade Desk and LinkedIn. This occurred through the operation of software and code on the Website.

## Defendant Shares Visitors' Data with at least 2 Data Brokers and 1 Social Media Company

22. Defendant has partnered with at least two registered California data brokers, 6Sense and Trade Desk, in order to deanonymize and develop clandestine user profiles on otherwise anonymous visitors to the Website. Defendant has done this by installing code and tools proprietary to 6Sense and Trade Desk on the Website.

23. Defendant has also partnered with LinkedIn in order to identify and track visitors to its Website for Defendant's benefit, as well as that of LinkedIn, and possibly other social media-platform running companies, by installing code proprietary to these companies.

24. The 6Sense and Trade Desk code deployed on the Website is designed to track and correlate visitors by capturing electronic impulses transmitted from the

CLASS ACTION COMPLAINT

6

devices of visitors to a website on which it is deployed. The process initiated by the 6Sense and Trade Desk code identifies visitors through "browser fingerprinting." Fingerprinting allows data brokers like 6Sense and Trade Desk to ascertain the identity of a website visitor by plotting hundreds of personal identifiers, including a user's geolocation, device information, identification and cross-referencing of malicious cookies installed on their devices, and other traits evident from a user's browser. The Linked In code deployed on the Website work in similar ways, as described *infra*.

### Browser Fingerprinting

25. Why does it matter that data about a Website visitor such as the size of her screen, her device's brand name and her browser settings get transmitted to 6Sense, Trade Desk and LinkedIn? One would think that the sharing of such seemingly non-personal data cannot impact a visitor's life or internet experience. This assumption is simply incorrect.

26. The fact is that when you visit a website, ***and before you get to assert your choice regarding whether you should be targeted with ads, identified by third parties, or tracked on the internet on an ongoing basis***, hundreds of non-personal data points tell data brokers and social media companies who you are. (This data is *frequently* combined with information such as the webpage you arrived from, and *sometimes* with information already in the hands of data brokers and social media companies including your name and email addresses, as well as other websites you have visited in the past.)

27. To be clear, ***website operators*** require some of the data points at issue to render a website on their visitors' devices. For example, a website will only load appear properly with information about a visitor's device characteristics and configurations, including screen size. What is being discussed here – and what is at issue in this action – is this information being provided to ***third parties not involved in operation of the website itself, or the rendering of the website on the screens of***

*visitors.* The data brokers and social media companies do not need the data to operate any website, or for any purpose other than to identify, target and track website visitors.

28. As explained in an article in the October 2025 issue of *Wired Magazine*:

Your browser fingerprint is a collection of innocuous information about your PC that, ***when put together, is unique enough that it could identify an individual***. Some of the components of your browser fingerprint include your computer's hardware, your browser and version, the various versions of software you have running in your browser, the fonts you have installed on your PC, your time zone, your system language, your keyboard layout; the list goes on. Out of the dozens of pieces of information, none of them could identify you individually. It's when this data is bundled together that your fingerprint becomes unique.[3]

29. The fingerprinting process works even when a visitor does not enter any items *colloquially referred to* as "personal data" – such as name, telephone number, address or email address – into a website.[4]

---

[3] Jacob Roach, "Here's What Your Browser Is Telling Everyone About You: Your browser sends a lot of information with each website you visit. That can be used to track you across the internet." (Wired Magazine, Oct. 16, 2025), available at https://www.wired.com/story/what-is-browser-fingerprinting/ (last viewed 2/22/2026).

[4] As discussed *infra*, in the privacy context, "personal information" can be used to refer to any information that can assist in identifying a person.

30. In 2025, researchers at U.S. universities found evidence of the use of browser fingerprinting by websites, particularly in connection with advertising.[5] Through research, Dr. Yinzhi Cao, Associate Professor of Computer Science and Technical Director of the Information Security Institute at Johns Hopkins University, and other scholars, have "correlate[d] browser fingerprints and ad behaviors, essentially establishing the relationship between web tracking and fingerprinting."[6]

**The Cycle of Third-Party Collection of Consumer Data and**

**the Tracking of Consumers**

31. Collection of visitor data by entities such as 6Sense, Trade Desk and LinkedIn – including collection by these entities of unique identifiers that the 6Sense, Trade Desk and LinkedIn code assigns to visitors to the websites of advertising companies like Powerfleet – enables ongoing tracking of website visitors as they visit new websites in the future. At the same time, the tracking of a person's internet browsing going forward provides more opportunities for data collection (and profile building) about an individual. This cycle aids the advertising and/or data monetization efforts of 6Sense, Trade Desk and LinkedIn and similar organizations.

32. As California Attorney General Rob Bonta explained in a 2022 California Superior Court complaint filed against retailer/website operator Sephora USA, Inc.:

> Consumers are constantly tracked when they go online.
>
> Sephora, like many online retailers, allows third-party

---

[5] Texas A&M Univ. Dep't of Computer Science and Engineering, "Websites Are Tracking You Via Browser Fingerprinting: New research provides the first evidence of the use of browser fingerprints for online tracking." (Texas A&M Stories June 26, 2025), available at https://stories.tamu.edu/news/2025/06/26/websites-are-tracking-you-via-browser-fingerprinting/ (last viewed 2/22/2026).

[6] *Id.*

companies to install tracking software on its website and in its app so that these third parties can monitor consumers as they shop. The third parties track all types of data; in Sephora's case, third parties can track whether a consumer is using a MacBook or a Dell, the brand of eyeliner that a consumer puts in their "shopping cart," and even the precise location of the consumer. Some of these third-party companies create entire profiles of users who visit Sephora's website, which the third parties then use for Sephora's benefit. For example, the third party might provide detailed analytics information about Sephora's customers and provide that to Sephora, or offer Sephora the opportunity to purchase online ads targeting specific consumers [ . . . ]. This data about consumers is frequently kept by companies and used for the benefit of other businesses, without the knowledge or consent of the consumer.

Complaint, *People of the State of California v. Sephora USA, Inc.*, CGC-22-601380, 2022 CA Sup. Ct. Pleadings LEXIS 38450 (Cal. Super. Ct., San Francisco Co., Aug. 24, 2022) (the "*Sephora* Complaint"), at 2:2-13.

### Registered California Data Brokers

33.    Data Brokers are companies whose core business is to collect, aggregate, analyze, and sell or license personal and non-personal data about individuals and organizations.  Data Brokers operate largely behind the scenes, often without direct interaction with the individuals whose data they monetize.

34.    Data Brokers gather information from a wide variety of sources, including by purchasing information from commercial sources like retailers,

financial institutions, online marketplaces, subscription services, and loyalty programs.

35.   Once the data is collected it is consolidated and organized into comprehensive profiles that may include thousands of attributes per individual. The data is then cross-referenced and linked using unique identifiers like device IDs and cookies to unify data about individual users from multiple sources.

36.   Data Brokers are accumulating data and profiling individuals to an alarming extent. As the CEO of a Data Broker recently described the extent of their surveillance abilities as to an otherwise anonymous individual: "We know who she is, what she watches, what she reads, and who she lives with. [We] also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys. We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation."[7]

37.   Given the amount of data available by way of the Data Brokers' practices, a company like Defendant has an incentive to partner with a Data Broker so that it can learn the identity of their website visitors in order to harass them with unwanted solicitations.

38.   Here, Defendant partnered with two Data Brokers, 6Sense and Trade Desk by installing 6Sense and Trade Desk code onto the Website. Defendant allows 6Sense and Trade Desk, and possibly other Data Brokers, to access, use, and

---

[7] Lucas Ropek, "Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users" (Gizmodo.com March 15, 2025), available at https://gizmodo.com/data-broker-brags-about-having-highly-detailed-personal-information-on-nearly-all-internet-users-2000575762 (last viewed 2/22/2026).

CLASS ACTION COMPLAINT

11

monetize the data provided by Defendant, in ways that remain undisclosed to the public.

**6Sense Code**

39.     6sense helps companies like Defendant to identify anonymous website visitors and their organizations, through the 6Sense code being installed on their websites.   According to 6Sense, the 6Sense DBSDK "connects the unknown, anonymous prospect to the known, seeing every step and footprint of every potential buyer." As a registered California Data Broker, 6sense, through the 6Sense code, aggregates data to de-anonymize web traffic and enable targeted advertising and sales outreach as follows:

40.     First, the 6Sense code deploys JavaScript tags (the "6Sense Tag" or "Visitor Recognition" script) on client websites. When a user visits a site, the 6sense Tag automatically fires, collecting data about the user's interactions, including page URLs, timestamps, clicks, and browsing behavior.

41.     Second, the 6Sense code causes cookies (e.g. _gd_visitor, _gd_session) and pixel tags to be installed on the user's browser to recognize that user across visits and devices.  These cookies persist up to one (1) year and store a unique identifier that tracks the visitor's site usage (e.g. number of visits, time spent).  Unique identifiers stored in such cookies consist of alphanumeric strings that become associated with a particular person and the device they use to navigate the internet.

42.     Third, the 6Sense code stores information gathered from these processes by way of JSON files, and sends the information back to 6Sense.

43.     Fourth, the 6Sense code "compiles data and correlates that data with external records."  In other words, the 6Sense code matches the captured information to its extensive database of company and buyer information that exists separate from the Website and the data collected about a visitor to the Website.

44. Plaintiff was subjected to the 6Sense code as described *supra* starting when she requested that the Website load onto her device (her screen) on May 9, 2025.

<strong>Trade Desk Code</strong>

45. Trade Desk is a data broker that collects data to build profiles about individuals without their knowledge or consent in order to sell ads. Trade Desk's technology is so comprehensive that it allows for marketers to push ads to "a specific location, at a given time, in front of a particular Internet user."[8]

46. The Trade Desk software deployed on Defendant's site identifies a user by identifying their device and then matching this information with their database. According to Trade Desk, "[d]evices are identified through unique identifiers stored in cookies provided by device operating systems for advertising purposes, or are generated based on statistical algorithms applied to information about a device, such as the IP address and device type."[9]

47. Simply by visiting a site with Trade Desk software deployed, Trade Desk is able to track user behavior across websites and apps using cookies, device fingerprints, and probabilistic matching. Trade Desk also connects a user's behavior across multiple devices (e.g., mobile, desktop, TV) to a single identity.

48. Trade Desk's business depends on identifying website users without their knowledge. In fact, Trade Desk has stated publicly that their business depends on "ingesting more identifiable information" about individuals.[10] Such information

---

[8] The Trade Desk Inc.. 2025 Form 10-Q (filed November 6, 2025), available at https://investors.thetradedesk.com/financials/sec-filings/ (last viewed 3/13/2026), at 39-40.

[9] *Id.*, at 40-41.

[10] *Id.*, at 43.

would include information of visitors to Defendant's Website transmitted to Trade Desk due to the deployment of Trade Desk code on the Website.

49. The Trade Desk code deploys tracking cookies that are dropped on visitor's devices to follow users across the web. Cookies are pieces of software code placed by Trade Desk and stored on a user's web browser. Cookies allow Trade Desk to "distinguish between, recognize, and store data about unique web browsers and devices, and to store data on [Trade Desk's] servers[.]".[11] The cookies further allow Trade Desk to "recognize web browsers across sites and over time, and therefore to record information about them over time."[12] Trade Desk cookies store and cause the transmission of a unique identifier that enables Trade Desk (and other entities with access to the cookies) to track users as they navigate a website, and any subsequent website where the cookies appear.

50. Plaintiff was subjected to the Trade Desk code as described *supra* starting when she requested that the Website load on her device on May 9, 2025.

## LinkedIn Code

51. LinkedIn is an advertising juggernaut. It earns billions each year through advertising its customers products and services on the LinkedIn social media platform. To accomplish this, it must collect tremendous amounts of data from individuals browsing the internet, identifying them, and building (and later enhancing) profiles on them.

52. Defendant installed and configured LinkedIn code on its Website to enable covert identification, tracking, and profiling of unsuspecting visitors by LinkedIn for Defendant's benefit, all visitors' knowledge or consent.

---

[11] https://www.thetradedesk.com/legal/privacy#The_Data_Platform_Collects (last viewed 3/13/2026).

[12] *Id.*

CLASS ACTION COMPLAINT

14

53. LinkedIn's own promotional materials for the LinkedIn code explicitly state that it "unlocks powerful demographic insights about your website visitors, including their job titles, companies, industries, and more."

54. The LinkedIn code installed on the Website collects and relies on device- and browser-related data that seems merely technical and innocuous but that are frequently used to confirm a website visitor's identity. These include such minor things as browser type, version, and configuration settings, operating system architecture/version information, and display characteristics such as screen resolution and color depth. As alleged *supra*, an individual can be identified based on such data, particularly when a company like LinkedIn has the individual's approximate location.

55. The LinkedIn code specifically targets data elements that create unique digital signatures for individual users, including Plaintiff and members of the putative class. The code causes an identifier (LinkedIn Ads ID, li_adsid) to be added into visitors' browsers (which exist on their devices) that is "persistent" – meaning it can last months or even years after the visitor's visit to a website ends. The persistent identifier(s) loaded onto a visitor's browser on her device *links* her visits to different websites, what she buys on them, pages she selects to view, and information she enters *to a unified advertising profile of her*. This profile is used to track when she makes purchases, and to target her with ads for a website operator's products when she goes to other websites. This is referred to as "retargeting."

56. ***LinkedIn also represents to customers like Defendant that it uses profiles of individual visitors to reach them across devices.*** Defendant installed LinkedIn code on its Website to enable reliable visitor identification and long-term tracking across multiple website sessions.

57. LinkedIn explains that installing the software "creates cookies" and a first-party pseudonymous identifier on visitors' browsers, supporting LinkedIn's

ability to build website audiences for retargeting and to perform conversion tracking tied to member accounts.

58.    LinkedIn publicly discloses to potential customers like Defendant that the "Personalized Advertising" cookies part of the LinkedIn Software include:

(a) UserMatchHistory, used for an ID synchronization process and storing the last sync time;

(b) li_sugr, used to make a probabilistic match of a website visitor's identity; and

(c) _guid, used to identify a LinkedIn member for advertising through Google ads (relevant where the visitor is a LinkedIn member and the cookie is applicable).

59.    The UserMatchHistory cookie, using the persistent identifiers that are loaded onto a visitor's device by the LinkedIn code, allows LinkedIn to match up visits to different websites that deploy the LinkedIn code and tie them to a single individual.

60.    By deploying the LinkedIn code, Defendant actively facilitates the immediate transmission of harvested identifying information from visitors' devices to LinkedIn's servers, including domains such as px.ads.linkedin.com, www.linkedin.com/px/, and snap.licdn.com. LinkedIn itself identifies (at minimum) snap.licdn.com and px.ads.linkedin.com as domains associated with the LinkedIn code's operation.

61.    Plaintiff was subjected to the LinkedIn code as described *supra* starting when she requested that the Website load on her device on May 9, 2025.

### Troubling Implications of Third-Party Data Sharing

62.    Companies using third-party tracking software – such as the 6Sense, Trade Desk and LinkedIn code described above – often seek to downplay its significance. They emphasize that the data collected by such software is being used simply to inform consumers about products they believe would be particularly

appealing to them. However, there is no guarantee that consumer data supplied to Data Brokers or social media platforms will be used solely for advertising purposes.

63. As Data Brokers, 6Sense, Trade Desk and LinkedIn can use data it received regarding Plaintiff's visit to the Website to further profile Plaintiff, with the objective of monetizing this data by selling or licensing it to other entities, including law enforcement and government agencies.

64. A recent report by the Brennan Center, a public policy nonprofit, has explained that "government agencies may purchase personal data to further their exercise of coercive powers, including the ability to deport, arrest, incarcerate, or even use lethal force."[13]

65. There are recent examples of tech companies exchanging information with the federal government in ways that threaten civil liberties and individuals with minority viewpoints. For example, U.S. Immigration and Customs Enforcement (ICE) has partnered with Palantir Technologies, a Denver-based software company, to use artificial intelligence and data mining to identify, track, and deport suspected noncitizens.[14]

66. Another example of such government data exchange is the provision by Meta, pursuant to valid warrants, of user data such as Facebook messages, for the purpose of investigating and prosecuting state crimes related to abortion.[15]

---

[13] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole

[14] https://www.americanimmigrationcouncil.org/blog/ice-immigrationos-palantir-ai-track-immigrants/ (last visited 2/6/2026).

[15] https://www.nbcnews.com/tech/tech-news/facebook-turned-chat-messages-mother-daughter-now-charged-abortion-rcna42185 (last visited 2/6/2026).

CLASS ACTION COMPLAINT
17

67. This month, Google handed over user data to the United States Department of Homeland Security ("DHS" or "Homeland Security") based on an administrative subpoena for the investigation of an individual based on the fact that he had written to a DHS attorney advocating on behalf of a refugee from Afghanistan in deportation proceedings.[16] No clear legal authority exists preventing the sale or dissemination of user data by Data Brokers to the federal government.

68. The New York Times reported on February 13, 2026, "Homeland Security is said to have sent Google and Meta hundreds of subpoenas for information to identify Americans who oppose ICE. Tech companies received legal requests for the names, email addresses, telephone numbers and other identifying data behind social media accounts that track or criticize the agency."[17]

69. As Attorney General Bonta explained in the *Sephora* case:

> The ramifications of this third-party surveillance can go beyond ordinary consumer profiling. Sephora's website allows visitors to browse and purchase products such as prenatal and menopause support vitamins—data points which can be used by third-party companies to infer conclusions about women's health conditions, like pregnancy. Moreover, when a company like Sephora utilizes third-party tracking technology without alerting

---

[16] https://newrepublic.com/post/206088/homeland-security-67-year-old-us-citizen-criticized-email (last visited 2/8/2026).

[17] *Homeland Security Wants Social Media Sites to Expose Anti-ICE Accounts* (N.Y. Times Feb. 13, 2026), available at https://www.nytimes.com/2026/02/13/technology/dhs-anti-ice-social-media.html (last visited 2/25/2026).

consumers and giving them the opportunity to control their data, they deprive consumers of the ability to limit the proliferation of their data on the web.

*Sephora* Complaint, at 2:14-20.

### Data and Related Profiles of Consumers Have Economic Value

70. The type of visitor data transmitted via the Website to 6Sense, Trade Desk and LinkedIn have economic value – as it obvious from the facts that these third parties create code to collect it, and that Defendant has installed the code on the Website. The value of this data – that of Plaintiff as well as that of members of the Class on whose behalf Plaintiff has filed this action – was diminished by Defendant's deployment of the 6Sense, Trade Desk and LinkedIn code on the Website.

71. The loss of anonymity that occurs through the type of visitor browser fingerprinting and subsequent tracking alleged herein imposes real costs on visitors to Defendant's Website, including Plaintiff and Class members. For example, in 2025, the Federal Trade Commission found that many websites use data such as "consumers' characteristics and behaviors, like location, demographics, browsing patterns and shopping history" to tailor consumer pricing.[18]

72. As recently explained by the Law Institute:[19]

---

[18] *See* https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-surveillance-pricing-study-indicates-wide-range-personal-data-used-set-individualized-consumer (U.S. Federal Trade Commission Jan. 17, 2025) (last visited 2/23/2026).

[19] https://thelaw.institute/cyberspace-technology-and-social-issues/identity-value-modern-economy/ (The Law Institute (Updated) Oct. 27, 2025) (last visited 2/23/2026).

CLASS ACTION COMPLAINT

19

In the modern economy, identity information has been described as the business of buying and selling information as a commodity. Unlike traditional physical commodities, personal data is intangible yet holds immense economic value. The transformation of identity into a tradeable asset has occurred gradually as technologies for collecting and analyzing personal information have become increasingly sophisticated. [ . . . ] Personal identity in the digital realm comprises multiple elements. Demographic information includes age, gender, location, income levels, and educational background. Behavioral data tracks online activities such as websites visited, products viewed, and time spent on particular pages. Transaction histories reveal purchasing patterns, payment methods, and brand preferences. Location data from smartphones and wearable devices provides real-time information about movements and habits. What makes identity information particularly valuable is its predictive power. By analyzing past behaviors and preferences, companies can anticipate future actions with remarkable accuracy. This ability to forecast consumer behavior translates directly into competitive advantages in marketing and product development. A complex ecosystem has emerged around the collection and trading of identity information. This marketplace operates largely invisibly to average consumers, yet it powers much of the modern digital economy. The global data brokerage industry was valued at approximately $270.4 billion in

CLASS ACTION COMPLAINT
20

2024, with projections indicating growth to $473.35 billion by 2032. [ . . . ] Advertisers and marketers purchase identity information to target specific consumer segments with tailored messages. Behavioral advertising uses internet cookies and tracking technologies to understand browsing tendencies and create defined audience segments. This allows companies to place advertisements in front of consumers most likely to respond positively.

73.    There exists an established market for the type of personal data collected through the 6Sense, Trade Desk and LinkedIn code running on the Website: data that facilitates the creation and enhancement of consumer profiles for individuals, and ongoing tracking of individuals' internet browsing. Defendant's surreptitious and unlawful transfer of personal information through the third-party code described herein on its Website diminished Plaintiff's and Class members' ability to participate in that market on informed terms, including to exercise the choice of whether to withhold, limit, or exchange their personal data for value.

## CLASS ALLEGATIONS

74.    Plaintiff brings this action individually and on behalf of all others similarly situation (the "Class") defined as follows:

> **All persons who, while located in California, visited the Website during the applicable limitations period, and were subjected to the operation of one or more of the 6Sense, Trade Desk and LinkedIn code running on the Website.**

75.    This action has been brought and may be properly maintained as a class action. There is a well-defined community of interest in the litigation and the proposed class is ascertainable.

76.    NUMEROSITY: Plaintiff does not know the number of Class members but believes the number to be in the thousands, if not more. The exact identities of Class members may be ascertained by the records maintained by Defendant.

77.    COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class.  Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

        a.  Whether Defendant's actions violate California common or statutory law;

        b.  Whether Plaintiff and Class members are entitled to statutory damages;

        c.  Whether Plaintiff and Class members are entitled to punitive damages;

        d.  Whether Plaintiff and Class members are entitled to injunctive relief;

        e.  Whether Plaintiff and Class members are entitled to the disgorgement of unlawfully obtained data; and

        f.  Whether Plaintiff and Class members are entitled to the disgorgement of profits.

78.    TYPICALITY: Plaintiff was subjected to the 6Sense, Trade Desk and LinkedIn running on the Website when she visited the Website on May 9, 2025.  As a result, her data was transmitted to 6Sense, Trade Desk and LinkedIn, and possibly other third parties, for fingerprinting and tracking purposes.  Her claims are therefore typical of the Class.

79.    ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has retained attorneys experienced in the class

action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

80. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class member is impracticable and inefficient. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

## FIRST CAUSE OF ACTION

**Violations of California Trap and Trace Law, Cal. Penal Code § 638.51**

81. Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

82. The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

83. A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." *Id.* § 638.50(c).

84. Each of the 6Sense, Trade Desk and LinkedIn code, as deployed on the Website, constitutes a trap and trace device under Cal. Penal Code § 638.50(c).

85. The "electronic communication" at issue in this case is the communication between the devices of Plaintiff and the Class members, on the one hand, and the Website, an instrumentality of Defendant, on the other hand. "Electronic communication" is defined under CIPA as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in

CLASS ACTION COMPLAINT

23

part by a wire, radio, electromagnetic, photoelectric, or photo-optical system." A visit to a website entails the transfer of signals and data, or "intelligence of any nature" by a "wire, radio [or] electromagnetic [ . . . ] system." Cal. Penal Code § 629.51(a)(2). The interactions of Plaintiff and Class members with the Website meet this definition.

86.    Each of the 6Sense, Trade Desk and LinkedIn code is designed to identify *to a reasonably likely degree* the source of the electronic communications between the devices of Plaintiff and Class members, on the one hand, and the Website, on the other, by 'capturing' the electronic or other impulses emanating from the devices that are "incoming" to the Website. The "**sources**" of the electronic communications moving from the devices to the Website are ***Plaintiff and the Class members (including their devices)***.

87.    Software or code running on websites that "captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication" constitutes a trap and trace device under §§ 638.50-51. *See, e.g., Alex & Ani, LLC*, 2026 LX 10546, at \*4-7 (C.D. Cal. Jan. 20, 2026); *Casillas v. Six Flags Ent. Corp.*, 2025 LX 518344, at \*21-22 (C.D. Cal. Dec. 15, 2025); *Lewis v. Magnite, Inc.*, 2025 LX 509487, at \*39-42 (C.D. Cal. Dec. 4, 2025); *Garon v. Keleops USA, Inc.*, 2025 LX 383838, at \*10-15 (N.D. Cal. Sep. 2, 2025); *Riganian v. LiveRamp Holdings, Inc.*, 791 F.Supp.3d 1075, 1093-1094 (N.D. Cal. July 18, 2025); *Gabrielli v. Motorola Mobility LLC*, 2025 U.S. Dist. LEXIS 133836, at \*30-32 (N.D. Cal. July 14, 2025); *Heiting v. Fka Distrib. Co.*, 2025 U.S. Dist. LEXIS 20076, at \*8 (C.D. Cal. Feb. 3, 2025); *Conohan v. Rad Power Bikes Inc.*, 2025 U.S. Dist. LEXIS 72865, 2025 WL 1111246, at \*16 (C.D. Cal. Apr. 3, 2025); *Mirmalek v. Los Angeles Times Commc'ns LLC*, 2024 U.S. Dist. LEXIS 227378, at \*6-10 (N.D. Cal. Dec. 12, 2024); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d

924, 930-931 (N.D. Cal. October 21, 2024); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076-1077 (C.D. Cal. July 25, 2024).

88. Defendant did not obtain a court order before using or installing each of the 6Sense, Trade Desk and LinkedIn code on the Website. Defendant also did not obtain consent from Plaintiff or any of the Class Members before using this technology, which is designed to reasonably likely identify Plaintiff and the Class members, along with their devices, as the source of electronic communications between them, on the one hand, and the Website, an instrumentality of Defendant, on the other hand.

89. Defendant did not obtain the express or implied consent of Plaintiff or Class members to be subjected to data-sharing or data-selling with or by or through 6Sense, Trade Desk and LinkedIn Indeed, Plaintiff and the Class members expressly opted out of such data-sharing or data-selling through the consent interface on the Website.

90. Defendant is ineligible for the statutory consent exemption from liability for use of a trap and trace device set forth in Cal. Penal Code § 638.51(b)(5). The § 638.51(b)(5) consent exemption is available only to a "provider of electronic or wire communication service." Defendant is not such a provider.

91. CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2; *see also Fandom,* 754 F. Supp. 3d at 932; *C2 Educ. Sys. Inc.*, 742 F. Supp. 3d at 1077-78.

92. Plaintiff and Class members are entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51.

## SECOND CAUSE OF ACTION

### Intrusion Upon Seclusion

93. Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

CLASS ACTION COMPLAINT

25

94. Under California law, a defendant is liable for intrusion upon seclusion when it intentionally intrudes into a private place, conversation, or matter in a manner that would be highly offensive to a reasonable person.

95. Defendant's deployment of 6Sense, Trade Desk and LinkedIn code on the Website intentionally intruded into a private conversation or matter Plaintiff and the Class members were involved in – namely their visit to the Website. The intrusion allowed 6Sense, Trade Desk and LinkedIn to identify, profile and track (on an ongoing basis) Plaintiff and Class members.

96. Plaintiff and the Class members never authorized the third-party cookies and other tracking technology initiated by the 6Sense, Trade Desk and LinkedIn code on the Website.

97. Plaintiff and Class members had an objectively reasonable expectation of privacy with respect to their conversation or exchange with Defendant over the Website, particularly in light of the fact that the Website relates to clothing sales. Plaintiff's choice of clothing and clothing size (including waist size) reveals information that a reasonable person would not want shared or sold third parties who, in turn, could sell it to other third parties.

98. Defendant's intrusion into Plaintiff's and Class members' visits to the Website was intentional, in that it involved deployment of software and configuration of the Website. Further, it was perpetrated for Defendant's economic benefit.

99. The intrusion described herein would be highly offensive to a reasonable person because it relates to information concerning his or her body and clothing size, information that she would not want to be shared across the internet.

100. Defendant's invasion of the privacy of Plaintiff and Class members damaged them and they are there entitled to compensatory damages, which includes monetary damages.

101. Plaintiff and Class members are entitled additionally to punitive damages because Defendant's use of the 6Sense, Trade Desk and LinkedIn code on the Website was malicious, oppressive and willful. That use includes both the installation of the code and the configuration of the Website to bypass what Plaintiff and the Class members believed were their decisions to stop all data-sharing and data-selling by the Website. Defendant's actions were made in conscious disregard of the choice made by Plaintiff and the Class members to stop the sharing with and selling to third parties of their personal data.

102. Plaintiff and Class members are entitled additionally to equitable relief in the form of enjoining Defendant from continuing to engage in its unlawful conduct, and disgorgement of profits earned by Defendant from its invasion of their privacy interests.

## **PRAYER**

WHEREFORE, Plaintiff, on her behalf and on behalf of the Class members, prays for the following relief against Defendant:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and appointing Plaintiff's attorneys as Class Counsel;

2. An award of statutory damages pursuant to CIPA;

3. An award of punitive damages;

4. An award of nominal damages;

5. An order for full restitution;

6. An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

7. An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

8. Reasonable attorneys' fees and costs; and

9. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

DATED: March 16, 2026        TAULER SMITH LLP

By: _____
           J. Evan Shapiro, Esq.

*Attorneys for Plaintiff Jane Heiting*

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.


DATED: March 16, 2026                              TAULER SMITH LLP


                                                   By: _____
                                                        J. Evan Shapiro, Esq.

                                                   *Attorneys for Plaintiff Jane Heiting*